NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0358n.06

No. 25-3437

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 13, 2026
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| ALA RAHIM YONAN, | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | ON PETITION FOR REVIEW OF AN ORDER OF THE BOARD OF IMMIGRATION APPEALS |
| | ) | |
| TODD BLANCHE, Attorney General, | ) | |
| Respondent. | ) | OPINION |
| | ) | |

Before: MOORE, CLAY, and NALBANDIAN, Circuit Judges.

MOORE, J., delivered the opinion of the court in which CLAY, J., concurred. NALBANDIAN, J. (pp. 14–16), delivered a separate dissenting opinion.

**KAREN NELSON MOORE, Circuit Judge.** Ala Rahim Yonan is a native and citizen of Iraq who was ordered removed in 2008. Fourteen years later, Yonan filed his third motion to reopen his immigration proceedings and seek relief under the Convention Against Torture ("CAT"), asserting that country conditions had materially deteriorated for Chaldean Catholic Christians like himself. The Board of Immigration Appeals ("BIA") twice denied his third motion to reopen. In doing so, however, the BIA applied the incorrect legal standard, determining that Yonan's changed-country-conditions evidence was immaterial by comparing it to country conditions post-dating his merits hearing. We therefore **GRANT** the petition for review, **VACATE** the Board's decision, and **REMAND** to the Board for further proceedings consistent with this opinion.

**I.  BACKGROUND**

Yonan is a native and citizen of Iraq, and a member of that country's Chaldean Christian minority.  *See* Administrative Record ("A.R.") at 2690 (Notice to Appear at 3); *id.* at 1524, 1528 (Application for Withholding of Removal at 1, 5); *id.* at 173 (7/25/2023 Ramadan Decl. at 2). Fleeing religious persecution, Yonan's parents brought him and his siblings to the United States in 1979.  *Id.* at 2690 (Notice to Appear at 3); *id.* at 1528 (Application for Withholding of Removal at 5).  Eight-year-old Yonan entered and obtained lawful-permanent-resident status because he was the minor child of his lawful-permanent-resident parents.  *Id.* at 245 (Third Mot. Reopen at 1); *id.* at 2104 (Application for Cancellation of Removal for Certain Permanent Residents at 1); *id.* at 2690 (Notice to Appear at 3).  Yonan has remained in the United States since he first entered the country forty-seven years ago.  As a result, Yonan considers himself a Westerner, does not speak Arabic, and lacks Iraqi identification documents.  *See id.* at 3 (6/2/2025 BIA Dec. at 1).

From the 1990s to the late 2000s Yonan committed multiple criminal offenses which rendered him removable.  In 1990, Yonan was convicted of unarmed robbery and fourth-degree criminal sexual conduct in Michigan state court.  *Id.* at 2690 (Notice to Appear at 3).  Nine years later, he pleaded guilty to possessing marijuana in Michigan state court.  *Id.*; *id.* at 1531 (Application for Withholding of Removal at 8).  And in 2007, Yonan pleaded guilty to conspiring to possess with intent to distribute over one-hundred kilograms of marijuana.  *Id.* at 2690 (Notice to Appear at 3); *id.* at 1531 (Application for Withholding of Removal at 8).  Because Yonan had committed "two crimes involving moral turpitude," *see* 8 U.S.C. § 1227(a)(2)(A)(ii) (2006), a controlled-substance offense, *see id.* § 1227(a)(2)(B)(i) (2006), and an aggravated felony, *see id.* § 1227(a)(2)(A)(iii) (2006), the Department of Homeland Security initiated removal proceedings

2

against him in May 2008, *see* A.R. at 2688–90 (Notice to Appear at 1–3). Later that month, an Immigration Judge ("IJ") ordered Yonan removed to Iraq after he conceded removability without seeking CAT protections. *See id.*; *id.* at 2289 (5/27/2008 IJ Order). Yonan also waived his right to appeal. *Id.* at 2289 (5/27/2008 IJ Order).

Yonan moved to reopen his removal proceedings for the first time in 2017. *See id.* at 1474 (First Mot. Reopen BIA Appeal at 3). In that motion, he argued that circumstances in Iraq had materially changed since 2008 such that he faced a new, increased risk of torture and sought the ability to apply for CAT relief. *See id.* The IJ denied Yonan's motion to reopen, and the BIA dismissed Yonan's appeal. *See id.* at 1206–08 (7/12/2018 BIA Dec. at 1–3).

Yonan filed a second motion to reopen his removal proceedings in October 2019. *Id.* at 740–67 (Second Mot. Reopen at 1–28). Again, he argued that conditions in Iraq had materially changed since 2008, increasing his risk of torture, and he sought to apply for CAT relief. *Id.* The BIA denied Yonan's second motion to reopen in July 2020. *Id.* at 524–27 (7/7/2020 BIA Dec. at 1–4). He then filed a petition for review, but we remanded to the BIA without addressing the merits of his petition in order to give the BIA the opportunity to distinguish Yonan's case from others in which it had granted relief. *Yonan v. Garland,* No. 20-3781, 2021 LX 43405, at *1–2 (6th Cir. May 24, 2021) (order). The BIA, on remand, again denied Yonan's motion to reopen. AR at 336–38 (11/12/2021 BIA Dec. at 1–3). Yonan did not ask us to review this second denial of his second motion to reopen.

In February 2022, Yonan filed a third motion to reopen. *Id.* at 245–65 (Third Mot. Reopen at 1–21). He again argued that conditions in Iraq had changed. *Id.* at 250–59 (Third Mot. Reopen at 6–15). Yonan largely focused on the resurgence of ISIS in 2022 and the ascendance of a network

3

of Iranian-backed militia groups called the Popular Mobilization Forces ("PMF"), which were formed in 2014 to combat ISIS. *See, e.g.*, *id.* at 306 (PBS Article); *id.* at 436 (Smith Decl. at 11). By 2021, Yohan claimed, the PMF had morphed from a group of private militias into a de facto arm of the Iraqi state—one with a track record of torturing Christians, particularly those it had stopped at checkpoints who were traveling without proper papers. *Id.* at 254–57 (Third Mot. Reopen at 10–13); *see also id.* at 267–68, 272–73, 277 (1/26/2022 Ramadan Decl. at 2–3, 7–8, 12). In particular, Yonan highlighted the fact that one of the PMF's leaders led the political party that won a plurality of the seats in Iraq's Parliament in October 2021. *Id.* at 256–57 (Third Mot. Reopen at 12–13); *see also id.* at 274 (1/26/2022 Ramadan Decl. at 9).

While his third motion to reopen was pending before the BIA, Yonan moved to remand the proceedings to an IJ in August 2023. *Id.* at 154–64 (Mot. to Remand 1–11). The remand motion supplemented the facts presented in the third motion to reopen, with Yonan describing how the Iraqi President had rescinded a longstanding decree acknowledging the religious authority of the Patriarch of the Chaldean Catholic Church in July 2023 and identifying specific instances where the PMF had tortured Christians in the mid-2010s and the early-2020s. *Id.* at 159–61 (Mot. to Remand at 6–8); *see also id.* at 189–90, 212 (7/25/2023 Ramadan Decl. at 18–19).

The BIA denied Yonan's third motion to reopen and motion to remand in December 2023. *Id.* at 145–47 (12/20/2023 BIA Dec. at 1–3). The BIA determined that the PMF's political ascendancy and the Iraqi President's decision to rescind the decree acknowledging the authority of the Chaldean Patriarch were incremental, not material changes in country conditions. *Id.* at 146–47 (12/20/2023 BIA Dec. at 2–3).

In January 2024, Yonan petitioned this court to review the BIA's order. We, however, granted the Government's motion to remand the case to the BIA following our decision in *Abdulahad v. Garland*, 99 F.4th 275 (6th Cir. 2024), so that the Board could address whether Yonan's multiple risk factors for torture, in the aggregate, warranted reopening. *See Yonan v. Garland*, No. 24-3029 (6th Cir. June 4, 2024) (order). Yonan thereafter submitted a supplemental brief to the BIA. A.R. at 24–25 (Suppl. Br. at 2–3).

The BIA again denied Yonan's third motion to reopen in June 2025. *Id.* at 3–4 (6/2/2025 BIA Dec. at 1–2). The BIA's decision adopted its 2023 decision and added "clarifying points" in light of *Abdulahad*. *Id.* at 3 (6/2/2025 BIA Dec. at 1). Specifically, the BIA noted that Yonan articulated five possible bases for torture in Iraq: (1) his status as a Chaldean Christian; (2) his decades-long U.S. residency; (3) his lack of Iraqi identity documents; (4) his inability to speak Arabic; (5) and his lack of family in Iraq. *Id.* The BIA then went on to explain that it had not discussed these risks separately in its prior order because Yonan's own expert stated that "having 'Western' sympathies and being Christian are often conflated in Iraq." *Id.* at 4 (6/2/2025 BIA Dec. at 2). And although it acknowledged that Yonan "has some risk of serious harm as a Westernized Christian man returning from the United States without identity documents and family in Iraq," it relied on its prior determination to conclude that any risk Yonan faced resulted from incremental, not material, changes in country conditions. *Id.* As an example, the BIA observed that Yonan failed to demonstrate that PMF demonstrated "greater impunity" or tortured more Christians "as a result of their political gains." *Id.*

Yonan thereafter timely filed the instant petition for review, D. 1-2 (Pet. for Review at 1–3), and simultaneously moved for an emergency stay of removal, D. 4 (Emergency Mot. for Stay

at 1–8), on June 10, 2025. The Government opposed, D. 6 (Gov't Opp'n to Pet'r's Emergency Mot. to Stay Removal at 1–8), and Yonan replied, D. 7 (Pet'r Stay Reply at 1–4). A little over six months later, a motions panel denied Yonan's stay motion. *Yonan v. Bondi*, No. 25-3437, 2025 LX 570372, at *9 (6th Cir. Dec. 12, 2025).

## II. ANALYSIS

### A. Jurisdiction

Yonan argues that the BIA applied the incorrect legal standard when it denied his motion to reopen and that we have jurisdiction to review that question. *See* D. 15 (Pet'r Br. at 3, 15–23). Title 8 U.S.C. § 1252(a)(2)(C) precludes us from "review[ing] any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in section . . . 1227(a)(2)(A)(iii), (B). . . ." Yonan was rendered removable by virtue of committing a controlled-substance offense, *see id.* § 1227(a)(2)(B)(i) (2006), and an aggravated felony, *see id.* § 1227(a)(2)(A)(iii) (2006). But "§ 1252(a)(2)(C) does not cover challenges to denials of [CAT] relief." *Kilic v. Barr*, 965 F.3d 469, 473 (6th Cir. 2020) (citing *Nasrallah v. Barr*, 590 U.S. 573, 579–83 (2020)). We thus have jurisdiction to consider Yonan's claim.

### B. Standard of Review

When the BIA issues its own decision, we review that decision "as a final agency determination." *Perez v. Bondi*, 160 F.4th 710, 713 (6th Cir. 2025). The BIA did so here, and we review its June 2025 and December 2023 decisions collectively because the former expressly adopted the latter. A.R. at 3 (6/2/2025 BIA Dec. at 1). We review de novo questions of law, such as whether the BIA applied the correct legal standard when resolving Yonan's motion to reopen. *See Marqus v. Barr*, 968 F.3d 583, 589 (6th Cir. 2020). "We review only 'the basis articulated in

the decision and [we] may not assume that the Board considered factors that it failed to mention in its opinion.'" *Abdulahad*, 99 F.4th at 284 (quoting *Preçetaj v. Sessions*, 907 F.3d 453, 458 (6th Cir. 2018)).

## C. Motion to Reopen

Typically, a noncitizen applying for immigration relief is limited to a single motion to reopen that must be filed within ninety days of the entry of the final order of removal. *Id.* (citing 8 C.F.R. § 1003.2(c)(2)). But the single-motion cap and the ninety-day deadline are subject to an exception for noncitizens seeking CAT protections "based on changed circumstances arising in the . . . country to which deportation has been ordered, if such evidence is material and was not available and would not have been discovered or presented at the previous hearing." *Id.* (quoting 8 C.F.R. § 1003.2(c)(3)(ii)); *Shabo v. Barr*, 836 F. App'x 370, 372 (6th Cir. 2020). Yonan filed the instant motion to reopen—his third—fourteen years after the ninety-day deadline, so he invoked the changed-country-conditions exception. A.R. at 248 (Third Mot. to Reopen at 4); *see also id.* at 24 (Suppl. Mot. at 2).

The exception is triggered when a noncitizen demonstrates that conditions in their country of removal have materially changed since their merits hearing. *Abdulahad*, 99 F.4th at 285. This means that we must compare country conditions at two moments in time, juxtaposing conditions at the time of the original merits hearing with those at the time the noncitizen filed the motion to reopen. *See Bi Feng Liu v. Holder*, 560 F.3d 485, 491 (6th Cir. 2009) (citing *Matter of S-Y-G*, 24 I. & N. Dec. 247, 253 (B.I.A. 2007)). If we conclude that hostility toward or persecution of the noncitizen's group has "'escalated' since the original immigration proceeding," then the changed country conditions are "material" and the exception applies. *Dieng v. Barr*, 947 F.3d 956, 962

(6th Cir. 2020) (quoting *Pablo Lorenzo v. Barr*, 779 F. App'x 366, 373–75 (6th Cir. 2019)). If, by contrast, conditions are static or undergo immaterial, "incremental or incidental" changes, then the successive or untimely motion is barred. *Abdulahad*, 99 F.4th at 286 (quoting *Matter of S-Y-G*, 24 I. & N. Dec. at 257).

The BIA identified the correct standard, citing *Matter of S-Y-G* and *Abdulahad*. *See* A.R. at 146–47 (12/20/2023 BIA Dec. at 2–3); *id.* at 3–4 (6/2/2025 BIA Dec. at 1–2). But the BIA must also apply the correct standard. *See Abdulahad*, 99 F.4th at 288; *Pablo Lorenzo*, 779 F. App'x at 373–75. Yonan asserts that the BIA did not apply the correct standard because it did not compare the country-conditions evidence that he presented in his third motion to reopen with country conditions in 2008 (when his merits hearing occurred). D. 15 (Pet'r Br. at 12–13).

We agree. It is error to compare country conditions as they existed at the time of a motion to reopen with country conditions postdating the petitioner's original merits hearing. *See Abdulahad*, 99 F.4th at 285–86; *accord Tulung v. Garland*, 102 F.4th 551, 557 (1st Cir. 2024) (explaining that country conditions at the time of the original merits hearing are the appropriate comparator because the "time gap" between multiple motions to reopen may "significantly and arbitrarily affect changed-conditions determinations" by making material "deterioration of conditions" since the merits hearing appear as mere incremental change since the prior to motion to reopen). But the BIA did just that. When evaluating the materiality of Iraq's 2023 rescission of its recognition of the Chaldean Patriarch, the BIA compared it to events that transpired long after Yonan's merits hearing. It observed, for one, that Iraq had taken other legal actions targeting Christians, "including . . . legislative action to ban the sale of alcohol." A.R. at 147 (12/20/2023 BIA Dec. at 3). The alcohol ban, however, was passed in March 2023, just months prior to the

rescission. *Id.* at 183, 204 (7/25/2023 Ramadan Decl. at 12, 33). The BIA also noted that Yonan's "expert declaration . . . describe[d] several incidents where Iraqi Christian deportees were killed or otherwise harmed," which "predate[d] the rescission of the decree." *Id.* at 147 (12/20/2023 BIA Dec. at 3). Indeed, they did—but the incidents of torture recounted in Yonan's expert's declaration also *postdated* Yonan's merits hearing. *See id.* at 189–90 (7/25/2023 Ramadan Decl. at 18–19). In short, the BIA determined that this county-conditions evidence was immaterial without ever comparing it to country conditions "that existed at the time of the [2008] merits hearing." *Bi Feng Liu*, 560 F.3d at 491 (quoting *Matter of S-Y-G*, I. & N. Dec. at 253).

Making matters worse, in its June 2025 decision, the Board explained that Yonan's "evidence does not show greater impunity for PMF forces or an increase in their torture of Christians as a result of their political gains." A.R. at 4 (6/2/2025 BIA Dec. at 2). Yet the record establishes that the PMF did not exist in 2008; it sprung into existence to combat ISIS in 2014. *See, e.g.*, *id.* at 306 (PBS Article); *id.* at 436 (Smith Decl. at 11) Thus, the BIA determined that a change in country conditions that occurred in 2021—the PMF securing a plurality in Iraq's parliament—was an immaterial, incremental change by comparing it to country conditions in the mid-2010s to early-2020s—when the PMF emerged and began torturing Christians. Instead, the BIA should have considered whether PMF forces in 2022 were materially different than the militias operating in Iraq in 2008—not whether the PMF in 2022 operated with greater impunity than it did since it arose in the mid-2010s. *See Abdulahad*, 99 F.4th at 285–86; *Tulung*, 102 F.4th

9

at 557. The BIA thus "applied the wrong legal standard[]" and "failed to properly consider [Yonan's] evidence." *See Pablo Lorenzo*, 779 F. App'x at 375.[1]

The Government's counterarguments are unpersuasive. For starters, the Government asserts that the BIA applied the proper standard because it considered country conditions in 2008. D. 29 (Resp't Br. at 16–17). To be sure, the BIA did observe that the "human rights situation" had been dire for Iraqi Christians in 2008, as a 2010 report described "'continued violence against religious minorities in 2009 and 2010," A.R. at 146 (12/20/2023 BIA Dec. at 2) (quoting *id.* at 2499 (U.S. Comm'n on Int'l Religious Freedom, Annual Rep. 68 (2010)), and Yonan's country-conditions expert broadly outlined the Christian exodus from Iraq that began in 2003, *id.* (citing

---

[1]The dissent admits that the BIA "compar[ed] the PMF's pre- and post-election character," but insists that the BIA proceeded to compare the PMF to "earlier militias" that targeted Christians in 2008. Dissent at 15. In reaching this conclusion, the dissent clings to a single sentence in the BIA's December 2023 opinion, which reads: "These militias are not new and have been targeting Christians with impunity throughout the period since the respondent's removal hearing." A.R. at 146 (12/20/2023 BIA Dec. at 2). In essence, the dissent argues that when the BIA wrote "[t]hese militias," it meant "earlier militias."

We disagree with our dissenting colleague's interpretation. To begin, the text of the BIA's December 2023 opinion suggests the BIA never analyzed "earlier militias." Read in context, "[t]hese militias" appears to have been a reference to the PMF. The Board had just finished discussing "PMF forces" and "one of the PMF's largest militias"— a natural reading of the BIA's opinion suggests that these militias and "[t]hese militias" were one and the same. *See id.* Indeed, the remainder of the sentence suggests that the BIA was not analyzing militias in 2008, as the BIA then described violence in "the period *since*" 2008. *Id.* (emphasis added). Bolstering this interpretation, in its June 2025 opinion, the BIA confirmed that it simply compared the PMF pre- and post-election. *Id.* at 4 (6/2/2025 BIA Dec. at 2).

The dissent's counterargument, moreover, is self-defeating. At most, it proves that the BIA's language is so vague that a remand is in order. The dissent asserts that the BIA's citation to the record clarifies that "[t]hese militias" meant "non-PMF" groups. Dissent at 15 n.1. True, the BIA cited the U.S. Commission on Religious Freedom's 2010 Annual Report. A.R. at 146 (citing *id.* at 2502 (U.S. Comm'n on Int'l Religious Freedom, Annual Rep. 71 (2010)). But while the dissent claims that the BIA attempted to cite a sliver of text that "caps off" a larger section addressing violence against religious minorities, including Christians, Dissent at 15 n.1., the Board, curiously, did not cite the pages housing the bulk of that section. Assuming, as the dissent does, that the Board intended to reference pages it did not cite, we are left to guess how the BIA attributed the violence described in that earlier section to militias in 2008. That violence was, by and large, carried out by unknown actors after Yonan's merits hearing. *See* A.R. at 2499–2501 (U.S. Comm'n on Int'l Religious Freedom, *supra* at 68–70). Whether the Board summarily attributed all of this post-2008 violence to militia groups operating in 2008 is unknown. In short, even under the dissent's interpretation, "we cannot be sure whether the [BIA] applied an improper standard," leading us to the same result: a remand. *Diallo v. Gonzales*, 241 F. App'x 312, 315 (6th Cir. 2007).

10

*id.* at 271 (1/26/2022 Ramadan Decl. at 6)).  The problem, however, is that the BIA dismissed Yonan's evidence concerning the rescission of the decree and the PMF's newfound parliamentary power without comparing it to this 2008 baseline.  The BIA instead explicitly compared Yonan's changed-country-conditions evidence only to periods *after* 2008.

In a footnote, the Government offers up two additional arguments.  It first attempts to pin the Board's error on Yonan because his third motion to reopen "explicitly stated that the 'relevant intervening period' was 2020 to 2022 and discussed only changes since 2020."  D. 29 (Resp't Br. at 17 n.4) (quoting A.R. at 251 (Third Mot. Reopen at 7)).  True, Yonan's third motion to reopen asked the BIA to compare country conditions in 2022 to those in 2020.  A.R. at 251 (Third Mot. Reopen at 7).  But after we remanded Yonan's case to the BIA in 2024, he filed a supplemental brief in which he properly identified country conditions in 2008—not 2020—as the appropriate comparator.  A.R. at 24–25 (Suppl. Br. at 2–3).  Rather than reframing its analysis, however, the BIA adopted its December 2023 decision and continued to compare Yonan's evidence of country conditions in 2022 to those in the mid- to late-2010s.  *See id.* at 3–4 (6/2/2025 BIA Dec. at 1–2).  The error, therefore, is the Board's.

Next, the Government faults Yonan for failing to present evidence concerning conditions in 2008, so as to allow the BIA to engage in the proper analysis.  D. 29 (Resp't Br. at 17 n.4).  Yonan very well may have failed to do so.  Yet "the BIA did not address this alleged omission by [Yonan] when it denied [Yonan's] motion to reopen, and 'the Board's denial of relief may be

affirmed only on the basis articulated in [its] decision.'" *Lindor v. Holder*, 317 F. App'x 492, 499 n.8 (6th Cir. 2009) (quoting *Daneshvar v. Ashcroft*, 355 F.3d 615, 626 (6th Cir. 2004)).[2]

Finally, we consider harmless error. The Government does not make a harmless error argument, and "[i]n this Circuit, we have we have endorsed a limited application of the harmless-error doctrine in the immigration context." *Abdulahad*, 99 F.4th at 295. "Instead, the 'proper course, except in rare circumstances, is to remand to the [BIA] for additional investigation or explanation.'" *Sebastian-Sebastian v. Garland*, 87 F.4th 838, 850 (6th Cir. 2023) (alteration in original) (quoting *Bi Xia Qu v. Holder*, 618 F.3d 602, 609 (6th Cir. 2010)); *cf. Gonzales v. Thomas*, 547 U.S. 183, 186 (2006) (per curiam) ("The law entrusts the agency to make the basic asylum eligibility decision. . . . A court of appeals is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions . . . . Rather the proper course . . . is to remand to the agency." (citation modified)). We have, albeit rarely, "upheld the BIA's decision 'on the basis of harmless error if the petitioner's prospects are otherwise so weak that there is no reason to believe . . . remand might lead to a different result.'" *Mazariegos-Rodas v. Garland*, 122 F.4th 655, 676 (6th Cir. 2024) (alteration in original) (quoting *Abdulahad*, 99 F.4th at 295).

"[T]his is not one of those rare instances." *Id.* The evidence in the record—including the sources cited by the BIA—suggests that the PMF may materially differ from the militia groups operating in Iraq in 2008. Granted, the record indicates that there were militia groups with ties to

---

[2]For much the same reason, we are unpersuaded by the dissent's attempt to discount the significance of the rescission of the decree recognizing the Chaldean Patriarch's authority. Dissent at 16. Even if the BIA could have deemed the rescission of the decree irrelevant to its analysis, it did not do so and "[w]e are not at liberty to search the law and the record for reasoning to support the BIA's decision because a court may not uphold an agency action on grounds not relied on by the agency." *Preçetaj*, 907 F.3d at 460 (quoting *Mickeviciute v. I.N.S.*, 327 F.3d 1159, 1162–63 (10th Cir. 2003)).

the Iraqi government in 2008. *See* A.R. at 2502 (U.S. Comm'n on Int'l Religious Freedom, *supra* at 71). That report, however, does not discuss how, if at all, those state-affiliated militia groups targeted Christians like Yonan. *See id.* (discussing these militias in a section addressing Sunni-Shi'a sectarian violence). Nor does it indicate that the militias targeted persons perceived as American, as the PMF has done. *See, e.g.*, *id.* at 434–36 (Smith Decl. at 9–11). In fact, the report suggests that the Iraqi government had been attempting to curb the sectarian violence carried out by those groups in 2008. *See id.* at 2502 (U.S. Comm'n on Int'l Religious Freedom, *supra* at 71) (discussing a State Department report that "during 2008–09, the Iraqi government 'became increasingly successful in restoring security, in a generally non-sectarian manner, throughout the country'"). Thus, Yonan may be able to demonstrate that the PMF—which controlled a plurality of Iraq's parliamentary seats, *id.* at 274 (1/26/2022 Ramadan Decl. at 9), and received billions from the Iraqi fisc as of 2022, *id.* at 195 (7/25/2023 Ramadan Decl. at 24)—presents a far greater risk of torture by state actors than did the militias operating in 2008. *See Marqus*, 968 F.3d at 587 ("An applicant seeking CAT relief must demonstrate that she faces a particularized and likely threat of torture at the hands of a public official, or with the consent or acquiescence of a public official.").

Accordingly, "[w]e therefore reverse and remand for the BIA to reconsider [Yonan's] motion to reopen based on changed country conditions using the correct evidentiary and legal standards." *See Pablo Lorenzo*, 779 F. App'x at 375.

## III. CONCLUSION

For the foregoing reasons, we **GRANT** the petition for review, **VACATE** the Board's decision, and **REMAND** to the Board for further proceedings consistent with this opinion.

13

**NALBANDIAN, Circuit Judge, dissenting.** I agree with the majority that the BIA's opinions aren't the picture of clarity. Even so, I don't think that any imprecision rises to the level of reversible error. *See Orta Martinez v. Bondi*, 2026 WL 208869, at *8 (6th Cir. Jan. 27, 2026) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." (citation modified)). Instead, because a natural reading of the BIA's opinions shows that it identified and applied the correct legal standard—and that any imperfections along the way don't overpower its otherwise sound conclusion—I respectfully dissent.

First, a brief recap of the legal standard governing motions to reopen removal proceedings. Such motions are generally disfavored. *See Preçetaj v. Sessions*, 907 F.3d 453, 457 (6th Cir. 2018) ("A party seeking reopening or reconsideration bears a heavy burden." (citation modified)). And because Yonan pursues CAT relief by reopening his proceedings past the normal rule limiting petitioners to one such motion to be filed within ninety days of the removal order, he must show that his claim is based on "material and previously unavailable evidence of changed country conditions" showing a likelihood of torture. *See Shabo v. Barr*, 836 F. App'x 370, 372 (6th Cir. 2020) (per curiam). Most importantly to this appeal, the BIA must evaluate a changed-country-conditions argument by "compar[ing] the evidence of country conditions submitted with the motion [to reopen] to those that existed at the time of the merits hearing below." *Abdulahad v. Garland*, 99 F.4th 275, 285 (6th Cir. 2024) (quoting *Bi Feng Liu v. Holder*, 560 F.3d 485, 491 (6th Cir. 2009)).

The majority holds that the BIA didn't properly apply the changed-conditions standard despite correctly identifying it. To support that view, the majority cites two examples that, in its

14

view, prove that the BIA compared country conditions significantly *after* 2008 to country conditions as of Yonan's motion for reopening. The first example doesn't convince. And the second shows, at most, a technically erroneous but ultimately harmless error on the BIA's part.

To start with, the majority faults the BIA for its discussion of the PMF's political gains in Iraq's 2021 parliamentary elections. The majority understands the BIA to have impermissibly treated the mid-2010s, when the PMF sprung into existence to fight ISIS, as the starting point for its analysis. But that's not right. In its 2023 opinion, the BIA explained that it was comparing the PMF's pre- and post-election character to determine whether its political gains enabled it to transgress against Christians materially more than earlier militias, which "[we]re not new and have been targeting Christians with impunity throughout the period since the respondent's removal hearing."[1] BIA 2023 Op., Admin. R., p.146. So the BIA didn't use the 2021 elections' effect to gauge how much worse the PMF was than when it started. Rather, the BIA gauged whether the elections made the PMF any worse than the militias transgressing against Christians back in 2008.

---

[1] The majority faults me for "cling[ing] to [this] single sentence" and misreading its content. Maj. Op. p.10 n.1. On the majority's read, the "[t]hese militias" part of "[t]hese militias [we]re not new" refers to the PMF itself, not other militias that existed in 2008. If that's true, then the majority is right that the BIA's discussion of the PMF had nothing to do with Iraq's country conditions as of 2008. But I disagree. In its quotation of the sentence in question, the majority omitted the citation the BIA offered in support. That citation directs the reader to a report from Yonan's exhibits. And the relevant text on the cited page caps off an extended discussion of non-PMF violence against Iraqi Christians in 2008, 2009, and 2010. Admin. R., pp.2500–02. So unless we have good reason to read the BIA's citation out of the BIA's opinion, "[t]hese militias" refers to the ones operating at the same time Yonan was going through his initial removal proceedings. Despite the majority's quibbles with the BIA's citation, the bottom line is this: the BIA leaned on a report discussing bad actors harming Christians in 2008 to support its conclusion that the actors harming Christians in 2022 weren't materially worse. That's enough for us to find that the BIA correctly applied the relevant standard as to its consideration of the PMF.

Nor does the BIA's 2025 opinion "[b]olster" the majority's interpretation. Maj. Op. p.10 n.1. The single on-point sentence in the BIA's 2025 opinion reads: "For example, we noted [in 2023] that the respondent's evidence does not show greater impunity for PMF forces or an increase in their torture of Christians as a result of their political gains." Admin. R., p.4. That sentence doesn't alter or walk back the BIA's 2023 discussion, which, as I've explained, is best read as assessing whether the 2021 elections emboldened the PMF to transgress against Christians more than the militias operating circa 2008.

Next, the majority objects to the BIA's treatment of the Iraqi president's decision to rescind the decree officially recognizing the head of the Chaldean Catholic Church. Admittedly, the rescission's place in the analysis is a head-scratcher. Neither the original decree, nor its rescission, bear on the two timeframes relevant to our analysis: 2008 or 2022. Iraq originally recognized the head of the Chaldean Catholic Church by decree in 2013, five years *after* Yonan's removal hearing. And Iraq's president rescinded the decree in mid-2023, more than a year after Yonan moved for reopening. In other words, the decree didn't exist at either of the two points in time that we must treat as the endpoints of the temporal analysis. So Yonan can't point to the decree's issuance to show favorable treatment of Christians as of 2008, and he can't point to its rescission to show heightened animus to Christians as of 2022. After all, the changed-conditions test calls for the BIA to evaluate whether "persecution of [the petitioner's] social group ha[s] escalated" between the two relevant points in time. *Dieng v. Barr*, 947 F.3d 956, 962 (6th Cir. 2020) (citation modified). Far from being an escalation, the Iraqi president's rescission of the decree recognizing the head of the Chaldean Catholic Church merely returned the country to the status quo as it existed when Yonan's final removal order issued. In any event, the BIA's consideration of the decree, and its rescission, was harmless. *See Abdulahad*, 99 F.4th at 295 ("If the agency's reasoning was inadequate, its decision may be upheld on the basis of harmless error" if "there is no reason to believe remand might lead to a different result." (citation modified)). Indeed, it benefitted Yonan by giving him another potential—albeit improper—ground for showing changed country conditions. So it's no reason to vacate and remand.

So because I read the BIA's opinions as applying the correct legal standard (and harmlessly considering technically extraneous arguments), I respectfully dissent.